## THE SILVERWAY. *

(District Court, S. D. Georgia, E. D. April 17, 1926.)

1. Salvage ⬄30.

For second class salvage in floating, in fair weather, ship which had run hard aground on shoals, compensation fixed, on consideration of facts, at $16,850.

2. Salvage ⬄37.

Compensation for floating stranded ship will be decreed against ship, freight, and cargo, pro rata, according to their value.

3. Salvage ⬄37.

Establishment of respective liabilities to salvors of floated ship, freight, and cargo is not even prima facie determinative of relative rights of cargo, charterer, and ship, as between themselves.

4. Admiralty ⬄57—Bond given by claimant shipowners, in suit in rem for salvage, held not to take place of released ship, relative to subsequent claim of cargo to be released from salvage liability because of ship's unseaworthiness.

The only claimed liability when, in suit in rem by salvors, bond was given by claimant shipowners, whereby ship was released, being salvage, to be collected out of ship, freight, and cargo, bond does not stand in place of ship, so as to make enforceable against it subsequent claim of cargo owner to be relieved of liability for any portion of adjudged salvage, on ground of unseaworthiness of ship, and it makes no difference that surety is the same on bond of both ship and cargo.

5. Admiralty ⬄48.

Proceeding under admiralty rule 56, in suit in rem for salvage, by petition of cargo owner to have all liability adjudged against shipowners because of unseaworthiness of ship, and consequent breach of contract, is independent, and cannot proceed till process is duly served.

6. Admiralty ⬄73.

Evidence taken previous to party being brought in to proceeding by petition under admiralty rule 56 cannot be used against him.

In Admiralty. Libel for salvage by the Atlantic Towing Company against the steamship Silverway, her engines, etc., with petition under admiralty rule 56 by the Savannah Sugar Refining Company, owner of the cargo. Decree in accordance with opinion.

Lawton & Cunningham, of Savannah, Ga. (T. M. Cunningham, Jr., of Savannah, Ga., of counsel), for libelants.

Barry, Wainwright, Thacher & Symmers, of New York City, and Hartridge, Wright &

*Decree affirmed 15 F.(2d) —.

Brennan, of Savannah, Ga. (Earle Farwell, of New York City, and A. P. Wright, of Savannah, Ga., of counsel), for the Silverway and owners.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Anderson, Cann & Cann, of Savannah, Ga. (John M. Woolsey, of New York City, and George T. Cann, of Savannah, Ga., of counsel), for cargo and owners.

Connerat & Hunter, of Savannah, Ga. (W. Spencer Connerat, of Savannah, Ga., of counsel), for charterers.

BARRETT, District Judge. 1. No effort will be made to record an attempted adjustment of the conflicting evidence as to details. It is the finding of the court that the following are substantially the facts:

On the afternoon of June 29, 1924, at 5:50 p. m., at about high water, the steamship Silverway, bound from Cuban ports to Savannah with a cargo of raw sugar, went aground on the shoals off the north end of Wassaw Island. The ship was going at full speed ahead and ran hard aground. The captain of the Silverway sent this wireless to the Savannah Sugar Refining Corporation:

"Want immediate assistance. Vessel aground. Making no water. Tybee Island Light bearing N.14°E. eleven miles."

Knowledge of this was first brought to the manager of the Atlantic Towing Company, Captain Spencer, by a boy, who had received it over radio, and thereafter he was advised of it by Mr. Robertson, of the Savannah Sugar Refining Corporation, about 8:30 o'clock in the evening. The pilot boat Christabel arrived at the scene of the stranding at 11 p. m. June 29th. The tugs Cynthia and Henry W. Grady began preparation at Savannah, about 30 miles from the Silverway, at 8:30 p. m., and arrived at the scene of the stranding at 3 a. m. on June 30th. The pilot boat and these two tugs attempted to pull off the Silverway on the morning tide of June 30th. The tug Jacob Paulsen left Jenkins Island at 1:25 p. m. June 30th, and arrived at scene of stranding at 4:15 p. m. These three tugs pulled on the Silverway the afternoon of June 30th, the Christabel not being present. The tug Wm. F. McCauley was notified on June 30th to come from Georgetown, and arrived at the ship at 3 a. m. on July 1st, went to Savannah, and brought back a 4,000-pound anchor and 200 fathoms of hawser, and arrived at the Silverway at 12:30 p. m. July 1st. On the morning tide of July 1st the Christabel, Cynthia, Grady, and Paulsen pulled on the steamer. On the afternoon tide of July 1st the Christabel, Cynthia, Grady, Paulsen, and McCauley pulled on the vessel, aided by the wrecking anchor, thereby succeeding in putting the Silverway afloat in about 15 minutes. The Cynthia supplied the steamship with fresh water necessary in working her engines.

The value of the vessels engaged in the pulling and the supplying of water was approximately $250,000; 231 bags of sugar were lightered before the vessel was finally floated. The weather was warm and on the whole free from storms or menace thereof, though there was a slight brief blow. The Silverway was at low water, aground substantially throughout its length, more deeply imbedded at the bow then at the stern. There was no loss to cargo. The service was strictly a salvage service, as no recovery for the service could be had unless success should be attained. There were 46 men engaged in the salvage, outside of the crew of the Silverway. The Silverway was valued at $100,000, the freight at $10,826.64, and the cargo at $290,537. The salvage was of the second class, as it did not demand any heroic efforts or unusual courage. There was some risk of injury to the tugs, but that was not great. There was a danger of the ship's being permanently disabled, if it had become firmly imbedded in the sand. There is severe criticism of Capt. Spencer, of the towing company, for delay in bringing and using the wrecking anchor. This is not merited.

[1, 2] The libel was brought on July 3, 1924, in behalf of the Atlantic Towing Company, the pilot boat, and all the men engaged, and it is urged that $20,000 is a reasonable amount for the salvage service for all parties. Libelees insist that the service is not worth more than $8,000 or $10,000. After diligent study of the facts, and applying to them the rules covering the measure of damages in cases of this kind, the amount of salvage compensation is fixed at $16,850, to be paid pro rata according to the value of the ship, freight, and cargo.

[3] The establishment of these respective liabilities to the salvors shall not be construed as conclusive, or as even prima facie determining, the relative rights of the cargo, the charterer, and the ship as between themselves. This is in consonance with the authorities. The R. D. Bibber, 50 F. 841, 2 C. C. A. 50; British & Foreign Marine Ins. Co. v. Kilgour S. S. Co. (D. C.) 184 F. 174; The Valdura (D. C.) 286 F. 747.

2. The ship and freight were claimed by Williams Bros. (Cardiff) Limited, and the cargo by the Savannah Sugar Refining Cor-

poration, and bonds given in the usual form, in the sum of $25,000 each, "unto the said libelants, or whomever it may concern." When the Silverway and the cargo answered the libel, no question was raised as to the respective liabilities of the Silverway or the charterer, the Munson Steamship Line, and the cargo. After the taking of the testimony, the Savannah Sugar Refining Corporation, on February 12, 1925, filed its petition averring that, by reason of the Silverway being unseaworthy, because not equipped with any sailing directions for navigation to Savannah, and not having any light books, or tide books, or adequate charts, its owners, Williams Bros. (Cardiff) Limited, and the time charterer, Munson Steamship Line, were both or either liable to pay the entire salvage and relieve the Savannah Sugar Refining Corporation from any portion of liability. Process was prayed against Williams Bros. (Cardiff) Limited, and Munson Steamship Line; that "Williams Bros. (Cardiff) Limited and said Munson Steamship Line may be proceeded against in the suit of the libelants herein to recover the salvage award claimed in the libel, as if the said parties respondent originally had been proceeded against herein, and that the rights and liabilities of all the parties herein be adjudged and determined in this proceeding"; that any recovery of the libelants be paid in the first instance by the steamship Silverway, Williams Bros., and Munson Steamship Line; and that petitioner be held entitled to recover from the Silverway, Williams Bros., and the Munson Steamship Line any amount which it may be liable to pay libelants as salvage.

On the 27th of August, 1925, it was ordered by the court that process issue against the Silverway, Williams Bros., and the Munson Steamship Line, but that the trial of the original libel should not be delayed to effect service of such process. No process has ever been served on Williams Bros. (Cardiff) Limited. By attachment and garnishment, issued on November 4, 1925, there has been impounded the sum of $7,218.29 owing by the South Atlantic Maritime Corporation, garnishee, to the Munson Steamship Line. The Munson Steamship Line has filed exceptions, claiming that it is relieved from all responsibility by reason of the following clause in the bill of lading issued by it for the cargo; the libel against it not having been begun within the six months prescribed:

"That the carrier shall not be liable for any claim for loss, * * * even if arising from negligence unless said claim is presented in writing forty-eight hours after landing of or failure to deliver the goods. No suit or proceeding on any claim shall be maintainable against carrier * * * unless begun within six months from the date of or failure to deliver the goods; and the lapse of such time shall be a complete bar to such suit or proceeding, even though the carrier may be a nonresident or a foreign corporation."

It also answered and claimed that it is not liable because there was no failure to provide a seaworthy vessel; that the stranding was due to faulty navigation, from which it is relieved by the terms of the bill of lading and by law, due diligence having been used to make the vessel seaworthy; and that, if there was any failure to make the vessel seaworthy, it was the fault of the owner, for which the time charterer, the Munson Steamship Line, is not responsible.

[4] 3. Can this court entertain the claim of the Savannah Sugar Refining Corporation against the owners of the ship Silverway, Williams Bros. (Cardiff) Limited, or against the bond, because the owners of the ship have filed a claim thereto and executed a bond in the sum of $25,000, as before stated? The urge is that, because the bond stands in the place of the ship, the claim of the cargo is as much enforceable against the bond as it would be against the ship, if still in the custody of the court. "The obligors in a stipulation given for the release of a vessel libeled for a collision are not, in the absence of an express agreement to that effect, responsible to intervenors in the suit, intervening after its release." The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

The opinion in The Oregon quoted Sir William Scott (afterwards Lord Stowell), treating a like claim of right, as follows: "If the court were to accede to the prayer of the crown upon this occasion, the effect would be monstrous; it would extinguish altogether the practice of delivering property upon bail, a mode so much encouraged by the court and by the Legislature."

Again from page 209 of the opinion (15 S. Ct. 813) we quote: "In other words, the contract of a surety, whether at common law or in admiralty, is one strictissimi juris, and cannot be changed by implication. While the bail is intended as a substitute for the property itself, it is only such, as stated by Sir William Scott, 'in all points fairly in adjudication before the court.'"

Again I quote from the opinion in The Oregon: "In all the cases cited, in which it has been said that the stipulation is a substitute for the thing itself, the remark has been made, either with reference to the particular suit in which the stipulation is given,

or with reference to a stipulation for the appraised value of the vessel, where the stipulation stands as security for any claim which may be filed against her up to the amount of the stipulation."

The T. W. Snook (D. C.) 51 F. 244 (cited with approval in The Haytian Republic, 154 U. S. 127, 14 S. Ct. 992, 38 L. Ed. 930, and in The Oregon, 158 U. S. 209, 15 S. Ct. 804, 39 L. Ed. 943), is to the same effect, basing its decision upon this principle: "The sureties on the bond must be presumed to have signed it solely on the understanding that their liability was only to satisfy the cause of action set out in the libel. * * * "

In the instant case the only claimed liability at the time that the bond was given was for salvage, to be collected out of the ship, freight, and cargo. If the proceeding now suggested were permitted, the surety might become liable for the entire salvage, which was manifestly not in contemplation at the time of the signing of the bond.

The fact that the surety is the same on the bond both of the ship and of the cargo is not material in the determination of this question, for it is presumed that the premium and the protection demanded by the surety of the ship was in contemplation of the liability it assumed, and the fact that by the proposed proceeding its principal in another bond might be relieved of liability, in whole or in part, does not effect its contract as surety of the ship.

Where a property has been libeled in rem, and no process has been served on the owner, not only is it true that a decree cannot be had on the bond given by the claimant, but a decree cannot be had in personam against the owner. The Monte A (D. C.) 12 F. 331; The Ethel, 66 F. 340, 13 C. C. A. 504; The Lowlands (D. C.) 147 F. 986; The Nora (D. C.) 181 F. 845.

Neither The Loyal, 204 F. 930, 123 C. C. A. 252, nor The Lackawanna (D. C.) 220 F. 1000, is in conflict with the foregoing principle. In the former case the owners appeared and answered the petition to implead them, thus clearly yielding to the jurisdiction. In the latter case the libel was not against the cargo, and the cargo was not before the court. While the principle is recognized (page 1002) that, "where the salvage services are rendered necessary by the ship's negligence, the cargo may be relieved from contribution and the vessel bound for the entire expense," as to which there is no dispute, this is consistent with the requirement that the procedure for the enforcement of such right must be by separate suit or by intervention with process properly served.

[5] 4. Authority has already been granted to have process against the owner, under admiralty rule 56. The proceeding under rule 56 is an independent proceeding. In this case the claim asserted is based upon an alleged breach of contract. In no event can it proceed until process shall have been "duly served." No process has been served upon Williams Bros. (Cardiff) Limited, and therefore no decree can be had against them herein prior to the service of such process, either in favor of the cargo or in favor of the Munson Steamship Line, by reason of the obligation alleged to have been undertaken by Williams Bros., Limited, in the charter party, or otherwise.

[6] 5. The Munson Steamship Line has been brought into this proceeding by attachment, with garnishment issued thereon, and it has also filed exceptions and answered the intervention of the cargo. The case will proceed to a determination of the issues between the cargo and the Munson Steamship Line. The evidence already taken was all taken prior to making the Munson Steamship Line a party, and therefore is not usable against such Munson Steamship Line as to the respective liabilities of it and the cargo. Reasonable opportunity will be afforded to the cargo and to the Munson Steamship Line to procure and present evidence sustaining their respective contentions. If it be desired, prior to such preparation, that argument or the submission of further brief be presented upon the exceptions of the Munson Steamship Line, this may be done at any time up to the 1st of July, 1926.

It will be decreed accordingly.